UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRACY CAIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DENIS RICHARD MCDONOUGH, )<br>Secretary of the Department of Veterans )<br>Affairs, )<br>)<br>Defendant. ) | Case No. 1:21-cv-634 |

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND DISMISSAL**
**(Doc. 17)**

Tracy Cain, a former police officer at the Department of Veterans Affairs (VA) hospital in Syracuse, New York, brings this Title VII suit against the Secretary of the VA alleging that the VA, as her employer, failed to adequately respond to Ms. Cain's complaint of sexual harassment by another VA police officer, Paul White. The Secretary moves for summary judgment, arguing that Mr. White was Ms. Cain's coworker, not her supervisor, and that the VA's response was reasonable under the applicable legal standard. Ms. Cain argues that Mr. White was her supervisor as that term is defined for purposes of Title VII and that the VA has failed to meet its burden of showing it took appropriate remedial measures after she reported Mr. White's behavior. The court concludes that the undisputed evidence establishes that Mr. White was not Ms. Cain's supervisor within the meaning of Title VII and that the VA's response to Ms. Cain's complaint was reasonable. Therefore, the court grants the Secretary's motion for summary judgment.

## Background

I. **Factual Background**

Ms. Cain, a former Law Enforcement Specialist in the United States Air Force, was hired as a VA police officer at the Syracuse VA Medical Center in September 2017. (Doc. 17-3 at 6, 12–13; Doc. 17-4 at 3–4.) Shortly after she started in this role, Ms. Cain began communicating with another officer at the Syracuse VA, Lieutenant Paul White. (Doc. 17-4 at 4–5; Doc. 17-5 at 4.) Mr. White was "a Supervisory Lt. Police Officer but not [Ms. Cain's] first line supervisor." (Doc. 17-5 at 4 n.1.) Ms. Cain and Mr. White began communicating by text message about work-related issues. (*Id.* at 4–5.)

On October 10, 2018 during a text exchange, Mr. White told Ms. Cain that he "just got out of the shower and [was] relaxing in [his] birthday suit." (Doc. 17-6 at 2; *see also* Doc. 17-5 at 5.) Ms. Cain thought that the October 10 text message was "icky and weird" and "a little creepy," but she "just brushed it off." (Doc. 17-3 at 14–15.)

In February 2019, Ms. Cain and Mr. White communicated through an instant messaging system at work; Ms. Cain discussed her "boring dating life" with Mr. White and "casually mentioned that [she] just need[ed] an 'FWB'" meaning "'[f]riend with benefits.'" (Doc. 17-7 at 2.) "[I]t seemed" to Ms. Cain "that in that moment, [Mr. White] decided he was going to be my FWB because he said something to that effect." (*Id.*) Ms. Cain did not precisely recall the exchange but remembered that Mr. White's messages "were sexual in nature" and to the effect that "he would be a great FWB." (*Id.*) Ms. Cain told Mr. White that he "did not qualify for a FWB because an FWB for [her] is a single guy who [she] can go play golf with, have dinner with, have great sex with and take to the Christmas Party." (*Id.*) Ms. Cain also told Mr. White that "he was not an FWB because he was married with kids and that is not FWB, that is an

2

affair!" (*Id.*) Ms. Cain was "taken back" by the conversation but "never said a word about it" because she "thought he was joking, and [she] didn't want to make waves." (*Id.*) She also liked Mr. White "as a mentor and friend." (*Id.*) Mr. White had helped Ms. Cain and another new employee "by giving [them] tours of the hospital, showing [them] what regulations to read, and, in general being our 'go to' officer." (*Id.*)

On March 7, 2019 during another text exchange,[1] Mr. White told Ms. Cain that he could come to her house at 5:30 in the morning in response to Ms. Cain asking Mr. White if he was working that weekend. (Doc. 21-1 at 8; Doc. 21-2 at 3.) In that same exchange, Mr. White sent Ms. Cain pictures of his genitalia both under his shorts and partially outside of his shorts and requested that Ms. Cain send him some photos in return, explaining that she "can stay up top" and "No vj." (Doc. 17-3 at 17–18; 17-6 at 12–15.) She refused. (Doc. 17-6 at 15.) Ms. Cain testified that she was not sure how she could work with Mr. White and was "feeling this sort of pressure from him." (Doc. 17-3 at 18.) At one point, she responded, "I didn't know we were playing tonight," (Doc. 17-3 at 18; Doc. 17-6 at 14) and explained after the fact that she "didn't know what to say" and "could have said that's inappropriate" but described the situation as one where "you felt so awkward [that] you say something that's really awkward" (Doc. 17-3 at 18).

During another text exchange the next day,[2] when Ms. Cain informed Mr. White that she had a date that night, Mr. White responded, "He better not get to see anything [I] wasn't shown

---

[1] The exhibits including the text exchanges between the parties do not show all of the dates. (*See* Doc. 17-6; Doc. 21-2.) This exchange, however, appears to have taken place on March 7, 2019, not March 6, 2019, as Defendant states. (*See* Doc. 21-2 at 3 (time stamp and beginning of exchange); Doc. 17-6 at 8–16 (continuation of exchange); *see also* Doc. 17-3 at 19.)

[2] Although the Secretary states that this exchange took place over two different days, March 7 and 8 (Doc. 17-2 ¶¶ 20–21), and Ms. Cain does not dispute that (Doc. 21-5 ¶¶ 20–21), it appears that the messages stem from a single day, March 8, given the reference during that

3

last night." (Doc. 17-6 at 18.) Mr. White also told Ms. Cain, "When you're showering and getting dressed just FaceTime me 😋." (*Id.* at 19.) Later that night, Mr. White texted, "I'm just getting home. Time to get naked." (*Id.* at 20.) When Ms. Cain responded that she was not yet home from the date, Mr. White responded, "This guys gonna [sic] ruin my FWB." (*Id.* at 21.) When Ms. Cain replied, "No," Mr. White said, "Hahaha you'll have to prove that to me sooner then [sic] later." (*Id.* at 21.)

The following day, March 9, Ms. Cain and Mr. White again exchanged messages. (*Id.* at 22.) Mr. White asked about Ms. Cain's date the previous night and if she got "some action." (*Id.*) When she responded that she had not, he replied, "Haha just asking. You never know, you could have leg loss [sic] and let the inhibitions loose." (*Id.*) He later informed Ms. Cain that he had "never done the one night stand either nor a FWB." (*Id.* at 23.)

Ms. Cain testified that Mr. White "asked several times" for pictures which was "not [her] style." (Doc. 17-3 at 16.) This happened "[o]n several different occasions" through text messages, in person, and using the "direct message system at work." (*Id.* at 17.) Ms. Cain "told him numerous times that that will never happen." (*Id.*)

In another text exchange in April 2019, Mr. White inquired what Ms. Cain was doing on Friday; she responded that she was busy with various events. (Doc. 17-6 at 29.) Mr. White replied, "Seriously I was going to suggest collect on FWB." (*Id.*) Ms. Cain selected the "Haha" reaction available through Apple iMessage and wrote back, "Sorry 😐." (*Id.*) Later in the exchange, Mr. White inquired why Ms. Cain was working so many hours and, when she explained, he remarked, "That doesn't help me in getting you naked." (*Id.* at 31.) Ms. Cain

---

exchange to the prior night's exchange and the reference to Ms. Cain's ongoing date, which Mr. White inquired about the following day, March 9 (*see* Doc. 17-6 at 22).

4

replied, "[T]hat may be on hold." (*Id.*) Mr. White responded, "Well I'll not ask until you hit me up and stick to 'taking care' of it myself. 😛." (*Id.* at 32.)

Ms. Cain followed up, explaining that she "met someone" and thought that "may develop into something." (*Id.*) Upon hearing this, Mr. White responded, "Really? Good but that doesn't help me. 😛 . . . Maybe you need a good romp before you cut out other trying other [sic] guys (me) haha." (*Id.*) Ms. Cain replied, "You make me giggle, thank you 😊." (*Id.*) Mr. White then said, "Well I'd make you cum first." (*Id.*) Ms. Cain then said, "Who knows," and explained that the guy she was seeing may not turn out to be such a nice person but told Mr. White, "You're a gentleman 😊." (*Id.* at 33.) Mr. White responded, "I love eating pussy[]." (*Id.*)

Beyond the text exchanges, Ms. Cain alleged that Mr. White engaged in similar sexually explicit conversations at work in person. (Doc. 17-5 at 5.) For example, Ms. Cain alleged that Mr. White asked about her breast size, and when she responded in an attempt to make him stop, he responded, "'I don't believe you, I have to see them to be the judge of that.'" (*Id.*) On another occasion, he grabbed Ms. Cain's t-shirt near her breast. (*Id.* at 5–6.)

Ms. Cain also explained how some of the employees at the VA had to park in a parking lot away from the building and take a shuttle to the VA and back to their cars. (Doc. 17-3 at 20.) Sometimes employees had to wait up to 40 minutes for a shuttle and, therefore, senior officers who could park closer to the building would often offer waiting employees a ride back to their cars. (*Id.*) On one occasion, Mr. White texted Ms. Cain to see if she needed a ride back to the parking lot. (*Id.*; *see also* Doc. 17-6 at 24.) Mr. White then inquired if another employee also parked there because it would be "[k]ind of hard to take you and not him." (Doc. 17-3 at 20; Doc. 17-6 at 24.)

5

Ms. Cain understood that Mr. White "was clearly having some sort of sexual ideation about the ride" to the parking lot "which is why the fact that when he saw [the other employee] it blew his little plan because he knew that he could not take just me." (Doc. 17-3 at 21.) She knew this, she explained, because she and Mr. White had been talking earlier in the day and "the essence of what he was saying was about, you know, feeling me up in the car or he was—he wanted me to feel him up in the car." (*Id.* at 21.) Ms. Cain explained that she had "never stalled so long in [her] life to leave work." (*Id.*) Ms. Cain texted Mr. White and told him she was talking to her supervisor to which Mr. White responded, "Well hell. I got my junk all prepped for you. Hahaha." (Doc. 17-6 at 25; *see also* Doc. 17-3 at 22.) Mr. White left without Ms. Cain; she did not end up traveling with him. (Doc. 17-6 at 25; Doc. 17-3 at 22.)

On May 2, 2019, Mr. White had switched shifts with Ms. Cain's normal supervisor, Robin Lawrence; he acted as Ms. Cain's first-line supervisor that day. (Doc. 17-3 at 27; Doc. 17-5 at 7–8.) Mr. White verbally mentioned to Ms. Cain something to the effect of "collecting on his FWB." (Doc. 17-5 at 8.) Ms. Cain informed Mr. White that "things were going well with the man" she had started dating. (*Id.*) After that, Mr. White was "cold and abrupt" towards Ms. Cain. (*Id.*; *see also* Doc. 17-3 at 26.) When Ms. Cain asked him for help at one point, he told her to "figure it out." (Doc. 17-3 at 27.) Ms. Cain testified that this was a "non-typical response from him to me." (*Id.*)

After that shift, Mr. White wrote an email to the VA police chief complaining about Ms. Cain's performance at work that day; he copied Ms. Cain's direct supervisor on the email. (*Id.* at 28, 36–37.) When Ms. Cain's direct supervisor, Ms. Lawrence, returned to work the next day, May 3, she discussed Mr. White's allegations with Ms. Cain; Ms. Lawrence investigated the allegations and determined that they were neither true nor credible and that Mr. White had

"twisted things that did happen to make it look as though it was [Ms. Cain's] fault." (*Id.* at 28, 41.) During this conversation, Ms. Cain became upset and began to cry; she exited the conversation quickly. (*Id.* at 41.) Ms. Lawrence called Ms. Cain later that day, but Ms. Cain was still too upset to speak. (*Id.* at 42.) After discussing the issue with her father, Ms. Cain then called Ms. Lawrence over the weekend and told her all that had happened. (*Id.* at 43–44; Doc. 17-10 at 4.) Ms. Lawrence called the VA police chief immediately. (Doc. 17-10 at 5.)

When she returned to work on Monday, May 6, Ms. Cain gave a statement to Criminal Investigator and Deputy Chief Joshua Spencer; she signed the statement the next day. (Doc. 17-3 at 44–45; Doc. 17-10 at 6.) After Ms. Cain reported Mr. White's behavior, the VA took several steps on May 7. (Doc. 17-5 at 9–10.) First, the VA changed Ms. Cain's shift so that she was not working the same shift as Mr. White. (Doc. 17-3 at 47–48; Doc. 17-5 at 9.) Second, the VA took away Mr. White's service weapon and removed his access to the weapon locker.[3] (Doc. 17-3 at 48–50; Doc. 17-5 at 10.) The VA also made Mr. White take his personal weapon home. (Doc. 17-3 at 50; Doc. 17-5 at 10.) Third, the VA relocated Mr. White to the pass and ID office, which was in another wing of the building. (Doc. 17-3 at 50; Doc. 17-5 at 10.) Fourth, the VA instructed Mr. White to stay there and not come into Ms. Cain's office area. (Doc. 17-3 at 50–51; Doc. 17-5 at 10.) Ms. Cain explained that she could not "express [her] gratitude to [the] chief, deputy chief and lieutenant who are amazing." (Doc. 17-3 at 48–49.) She testified that "[t]hey were very comprehensive in their response," that she was "[a]bsolutely" relieved by their response, and that they took appropriate action. (*Id.* at 50–51.)

---

[3] Ms. Cain expressed her fear to both Ms. Lawrence and the VA police chief that she would encounter Mr. White armed after he had told her he would come to her house. (Doc. 17-5 at 9.) Ms. Cain explained that, after Mr. White had texted her, she would walk around her house with her pistol at all times. (*Id.*)

7

After the VA's action, Mr. White came into Ms. Cain's area on three occasions. First, within a week of the VA instructing Mr. White not to go near Ms. Cain, he came into the area within Ms. Cain's office where people file administrative paperwork; he was shuffling papers. (*Id.* at 51–55.) She saw him coming so she pulled her chair into her cubicle and focused on her computer screen without looking at him. (*Id.* at 53.) He looked at Ms. Cain but did not say anything to her or touch her. (*Id.* at 52–53.) She did not report this because she "figured somebody" had told Mr. White to go retrieve some report. (*Id.* at 54.)

Second, between three and five days after the first incident (*id.* at 56), Ms. Cain knew, based on her intuition, that Mr. White was present in her office area again; she "heard him and . . . refused to look" (*id.* at 54). She stayed at her desk and continued to work. (*Id.* at 55.) Again, Mr. White did not speak to or touch Ms. Cain. (*Id.* at 57.) On the second occasion, Mr. White stayed for a longer period of time. (*Id.*) Ms. Cain also did not report this second incident because she "was not trying to make a big deal." (*Id.*)

Third, one to three days after the second incident, Mr. White returned and was again shuffling papers. (*Id.* at 58.) Ms. Cain described that "[i]t almost seemed [that] he was feeling emboldened and was just doing it." (*Id.*) On that occasion, Ms. Cain reported it to the chief. (*Id.*) The chief confirmed that Mr. White was to stay in the pass and ID office, but noted that he would need to come into Ms. Cain's area periodically; he confirmed, however, that Mr. White would not need to stay there for any period of time and spoke with Mr. White again. (*Id.* at 59.)

Mr. White came to Ms. Cain's office several more times after this third incident, but the visits were "incredibly brief," which Ms. Cain described as "the way that they should have been . . . from the very beginning." (*Id.* at 59–60.) Unlike the first three times, which Ms. Cain described as feeling like "he was clearly trying to intimidate [her]" (*id.* at 60), the subsequent

8

occasions Mr. White was in her office were "definitely for official business" (*id*). Ms. Cain felt that the chief responded appropriately to her complaint.[4] (*Id.*)

Also after Ms. Cain's complaint, Mr. White, as the most senior officer, was first on the list for overtime shifts. (Doc. 17-3 at 64.) He "frequently took overtime" on Ms. Cain's shift. (*Id.*) Ms. Cain never had contact with him during any of the times he took an overtime shift that coincided with Ms. Cain's. (*Id.* at 65.)

In July 2019 after the VA's investigation, the VA recommended that Mr. White be terminated, but the director of the facility overrode that decision. (*Id.* at 62.) Mr. White was placed on a last-chance agreement. (*Id.*) In November 2019, Ms. Cain transferred to the VA clinic in Buffalo, New York to be closer to her family. (*Id.* at 67.) From the time of her complaint to the time she left for Buffalo, Mr. White did not text Ms. Cain, did not have any physical contact with Ms. Cain, and did not write any other complaint against Ms. Cain. (*Id.*)

## II.   Procedural Background

Ms. Cain filed a single-count complaint against the Secretary alleging a violation of Title VII. (Doc. 4 ¶¶ 14–15.) The Secretary answered Ms. Cain's complaint. (Doc. 7.) Now, the

---

[4] In her affidavit, Ms. Cain asserts that Mr. White "continuously" came into her office area, "made a recurring habit" of doing so. (Doc. 21 ¶¶ 6, 10.) In her deposition, Ms. Cain testified that Mr. White came into her office area "[b]etween three and five" times after the stay-away order was in effect. (Doc. 17-3 at 52.) She explained that the first three were the times when Mr. White lingered. (*Id.* at 52–60.) After the third time, Ms. Cain reported Mr. White's behavior and the VA police chief spoke with Mr. White, after which his times in her office area were short and in line with Ms. Cain's expectations of the stay-away order. (*Id.* at 59–60.) Although the Secretary sees a discrepancy between Ms. Cain stating Mr. White "continuously" came into her office area and Ms. Cain's deposition testimony that it happened between three and five times (*see* Doc. 22 at 6–7), the court does not see any material inconsistency in those accounts. Whether Mr. White visited the space three to five times or more frequently does not affect the court's legal analysis.

Secretary moves for summary judgment. (Doc. 17.) Ms. Cain opposes this motion. (Doc. 21.) The Secretary filed a reply memorandum. (Doc. 22.) The court elects to rule on the papers.

## Legal Standard

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is *material* when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (emphasis added) (internal quotation marks omitted). A court reviewing a motion for summary judgment construes the record evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam).

## Analysis

Ms. Cain alleges a single count against the Secretary of the Department of Veterans Affairs for a violation of Title VII of the Civil Rights Act of 1964.[5] Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). For federal government employees, "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.* § 2000e-16(a). Title VII's prohibition on sex discrimination "extends to sexual harassment" and claims of hostile work environment premised on sexual

---

[5] *See* 42 U.S.C. § 2000e-16(c) (noting that plaintiff must name the head of the "department, agency, or unit, as appropriate" as the defendant).

harassment. *Petrosino v. Bell Atl.*, 385 F.3d 210, 220–21 (2d Cir. 2004) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63–68 (1986)).

"To state a hostile work environment claim in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted).

The Secretary does not dispute that Ms. Cain has made out the three elements necessary to her hostile work environment claim. Instead, the Secretary moves for summary judgment on the grounds that the VA, as Ms. Cain's employer, is not liable because it took appropriate steps to address Ms. Cain's complaint about Mr. White. (*See* Doc. 17-1.)

Where, as here, Ms. Cain is suing her employer, a plaintiff must show that "a specific basis exists for imputing the objectionable conduct to the employer." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (internal quotation marks omitted). "An employer's liability for hostile work environment claims depends on whether the underlying harassment is perpetrated by the plaintiff's supervisor or h[er] non-supervisory co-workers." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015). The parties dispute whether Mr. White was Ms. Cain's supervisor or one of her non-supervisory coworkers. The court turns to this issue first.

I. **Supervisor Versus Coworker**

"[A]n employee is a 'supervisor' for purposes of the employer's vicarious liability under Title VII if he or she is empowered by the employer 'to take tangible employment actions against

11

the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013)). A supervisor is "a distinct class" "empowered by the company . . . to make economic decisions affecting other employees under his or her control." *Vance*, 570 U.S. at 440. "[T]he question of supervisor status, when contested, can very often be resolved as a matter of law before trial." *Id.* at 443.

The Secretary argues that Mr. White was Ms. Cain's coworker. (Doc. 17-1 at 5; Doc. 22 at 2–3.) This is based primarily on one of Ms. Cain's responses to the Secretary's first set of interrogatories in which she stated: "Defendant violated Title VII of the Civil Rights Act of 1964 by failing to remedy, failing to prevent, encouraging, and condoning a male *coworker's* sexual harassment of Plaintiff between October 2018 and August 2019." (Doc. 17-4 at 4 (emphasis added).) The Secretary also argues that Ms. Cain failed to meet the standard the Supreme Court articulated in *Vance*. (Doc. 22 at 4–5.)

In contrast, Ms. Cain argues that Mr. White was a supervisor based both on his title and on the fact that Mr. White was acting as Ms. Cain's first-line supervisor on the day he made the complaint against her. (Doc. 21-6 at 5.) For example, the affidavit for Ms. Cain's EEO complaint explained that "[i]nformation from the agency indicates that [Mr. White], alleged harasser, was a Supervisory Lt. Police Officer but not the complainant's first line supervisor." (Doc. 17-5 at 4 n.1.) And, on the day that Mr. White made the complaint against Ms. Cain, Mr. White had switched shifts with Ms. Cain's normal supervisor and acted as Ms. Cain's first-line supervisor that day. (Doc. 17-3 at 27; Doc. 17-5 at 7.) Ms. Cain argues that Mr. White's false allegations in his email complaint "can be reasonably construed as a 'tangible employment action'" sufficient

to make Mr. White a supervisor under the standard the Supreme Court articulated in *Vance*. (Doc. 21-6 at 5.)

For three reasons the court concludes that Mr. White was not Ms. Cain's "supervisor" as the Supreme Court has defined that term for purposes of a Title VII hostile work environment claim. First, Mr. White's title alone is insufficient to transform him into a supervisor for Title VII purposes. "'Supervisor' is a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties." 6 Emp. Coord. Employment Practices § 51:28 (July 2023 update) (quoting *Jajeh v. County of Cook*, 678 F.3d 560, 568 (7th Cir. 2012)). Other courts have come to the same conclusion. *See, e.g., Maiurano v. Cantor Fitzgerald Sec.*, No. 19 Civ. 10042, 2021 WL 76410, at *5 (S.D.N.Y. Jan. 8, 2021) (explaining that plaintiff's complaint describing defendant as "her direct supervisor" was insufficient to allege he was a "supervisor" for Title VII purposes and that "his title and supervision of Plaintiff's work alone are not sufficient"); *Walker v. City of Markham*, __ F. Supp. 3d __, 2023 WL 3918965, at *5 (N.D. Ill. June 9, 2023) ("[B]eyond identifying [Defendant's] title at the time, [Plaintiff] offers no evidence that [Defendant] was his 'supervisor' for Title VII purposes."); *see also Equal Emp. Opportunity Comm'n v. AutoZone, Inc.*, 692 F. App'x 280, 283–84 (6th Cir. 2017) ("[Defendant's] ability to direct the victims' work at the store and his title as store manager do not make him the victims' supervisor for purposes of Title VII."); *Vance*, 570 U.S. at 431 (rejecting "the nebulous definition of a 'supervisor' advocated in the EEOC Guidance").

Second, the single day that Mr. White served as Ms. Cain's first-line supervisor, during which he emailed a complaint about her work performance to the VA police chief, also does not transform him into a supervisor for Title VII purposes. "Courts interpreting *Vance* have made clear that an employee who supervises co-workers, conducts training, and manages coworkers'

13

day-to day activities is not a supervisor if they do not have the power to take tangible employment actions." *Turner v. PNC Fin. Servs. Grp., Inc.*, No. 20-CV-804, 2022 WL 214237, at *8 (W.D. Pa. Jan. 25, 2022) (collecting cases). Other courts have come to the same conclusion when confronted with analogous facts. *See, e.g.*, *AutoZone, Inc.*, 692 F. App'x at 283–84 (concluding that a store manager who could initiate disciplinary process and recommend demotion or promotion but could not hire or fire employees was not a "supervisor"); *Morrow v. Kroger Ltd. P'ship I*, 681 F. App'x 377, 380 (5th Cir. 2017) (concluding that a department manager who had some administrative responsibilities, including filling out performance evaluations, was not a "supervisor" because he could not take a tangible employment action); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 696 (E.D. Pa. 2016) (finding that training and supervising other staff members was not sufficient to make one a "supervisor" under Title VII).

Third, the court rejects Ms. Cain's argument that Mr. White's email complaint "can be reasonably construed as a 'tangible employment action'" under *Vance*. (Doc. 21-6 at 5.) A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 431 (internal quotation marks omitted). While Mr. White had the ability to complain about Ms. Cain's work performance on the day in question, there is no evidence in the record that he was "empowered by the [VA] . . . to make economic decisions affecting" Ms. Cain. *Id.* at 440. For example, a court rejected a plaintiff's argument that another employee was her "supervisor" where "the record evidence show[ed] that [the harasser] could not hire, fire, promote, or demote employees" and could not "set employees' compensation or even their work hours." *Bentley v. AutoZoners, LLC*, 935 F.3d

14

76, 91 (2d Cir. 2019). In that case, like here, the other employee had "the authority to discipline" the plaintiff but could "not formally discipline [the plaintiff], alter her hours, or changer her compensation." *Id.* at 92. The same analysis applies to the record evidence here. Even if Mr. White's email complaint demonstrates that he could informally discipline Ms. Cain, there is no record evidence demonstrating that Mr. White had the ability to take "tangible employment action" against her.

Therefore, the court concludes that Mr. White was Ms. Cain's coworker for purposes of her Title VII hostile work environment claim against the Secretary and turns to an analysis of her claim under the standard applicable to coworker harassment.

## II.    Merits of Claim

Where "'the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence.'" *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)); *accord Wiercinski*, 787 F.3d at 113. That means Ms. Cain "must demonstrate that her employer 'failed to provide a reasonable avenue for complaint' or that 'it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Duch*, 588 F.3d at 762 (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)).

To begin, the parties agree that the VA provided an avenue for Ms. Cain's complaint. The VA's Equal Employment Opportunity, Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement explains that the VA "has a zero-tolerance sexual harassment policy." (Doc. 17-8 at 4.) As for reporting, the policy explains:

> Employees have multiple avenues to report harassing conduct: (1) contact your internal departmental resources, including, but not limited to, your first line supervisor or the next level in your supervisory chain, if the harassment involves

>   your direct supervisor; (2) contact the local Harassment Prevention Coordinator for your office; or (3) contact the ORM Harassment Prevention Program . . . .

(*Id.* at 2, 5.) The VA Medical Center in Syracuse also has its own similar policy. (*See* Doc. 17-9 at 2.) The parties do not appear to dispute that the VA provided a reasonable avenue for Ms. Cain's complaint. (*See* Doc. 17-1 at 5–6; Doc. 21-6 at 6.) The court concludes that no reasonable jury could find that the VA failed in this regard.

Turning to the VA's response, courts assess the reasonableness of an employer's remedial action based on "the totality of the circumstances" considering "the gravity of the harm being inflicted upon the plaintiff"; "the nature of the employer's response in light of the employer's resources"; "and the nature of the work environment."[6] *Duch*, 588 F.3d at 766 (internal quotation marks omitted). "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and *prompt*, summary judgment is inappropriate." *Id.* (internal quotation marks omitted).

Here, no reasonable jury could conclude that the VA failed to respond promptly. Mr. White complained about Ms. Cain on May 2, 2019. (Doc. 17-3 at 28, 36–37.) Ms. Lawrence, Ms. Cain's first-line supervisor, spoke with her about the complaint the next day, Friday May 3, 2019. (*Id.* at 28, 41.) During that conversation, Ms. Cain became upset and left. (*Id.* at 41.) Ms. Lawrence followed up with Ms. Cain later that same day. (*Id.* at 42.) Ms. Cain then reached out to Ms. Lawrence over the weekend. (*Id.* at 43–44; Doc. 17-10 at 4.) When she returned to work on Monday, May 6, Ms. Cain gave a statement to Criminal Investigator and Deputy Chief Joshua

---

[6] The parties do not dispute that the VA knew about Ms. Cain's harassment after Ms. Cain reported the harassment to her first-line supervisor Ms. Lawrence. (*See* Doc. 17-1 at 6; Doc. 21-6 at 6.) The question, therefore, is whether the VA's response was adequate after it knew.

Spencer; she signed the statement the next day. (Doc. 17-3 at 44–45; Doc. 17-10 at 6.) On May 7, the VA initiated disciplinary action against Mr. White. (Doc. 17-5 at 9–10.)

The parties' dispute centers on whether the VA's response was adequate given Mr. White's three violations of the stay-away order and his decision to take overtime on Ms. Cain's shift. "To be sure, an employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) (cleaned up and internal quotation marks omitted). But it is also true that where "harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate." *Id*.

Here, the VA took immediate action including changing Ms. Cain's shift so that she was not working the same shift as Mr. White, taking away Mr. White's service weapon and removing his access to the weapon locker, making Mr. White take his personal weapon home, relocating Mr. White to the pass and ID office in another wing of the building, and instructing Mr. White to stay there and not come into Ms. Cain's office area.[7] The record indicates that Mr. White did come into Ms. Cain's office area after being reassigned to the pass and ID office but that his presence there was not clearly a violation of the VA's stay-away order. After the third time Mr. White entered Ms. Cain's office, she reported his behavior to the VA police chief. (Doc. 17-3 at 58.) When she inquired whether Mr. White should be in her office, the chief explained that Mr. White would have to be in that area occasionally but that those activities would not require

---

[7] Ms. Cain argues that the VA violated its own Harassment Prevention Program by failing to report Mr. White's conduct to the Harassment Prevention Coordinator. (Doc. 21-6 at 11.) But Ms. Cain does not cite any evidence in the record to support that assertion (*see id.*), as is her burden. Fed. R. Civ. P. 56(c)(1)(A). In its own review, the court also did not find any evidence in the record supporting this assertion. *Id.* 56(c)(3).

him to stay there for any length of time. (*Id.* at 59.) The chief then spoke with Mr. White again about his presence near Ms. Cain and he did not linger in her office area again. (*Id.* at 59–60.) During those times that he was in Ms. Cain's presence, he did not speak with her or touch her. (*Id.* at 52–53, 57.)

This is not a case where, for example, an employer provided only "relatively minor discipline (a reprimand)" and the employee continued to harass the plaintiff. *Johnson v. County of Nassau*, No. 10-CV-06061, 2014 WL 4700025, at *13 (E.D.N.Y. Sep. 22, 2014). It is also different from cases in which an employee continued to harass a plaintiff after an employer failed to stop the harassment and "effectively condoned it." *Cf. Tromblee v. N.Y. Office for People with Dev. Disabilities*, No. 19-cv-00638, 2023 WL 2655471, at *15 (N.D.N.Y. Mar. 27, 2023). The law does not place the onus on victims to police their own harasser after reporting the harassment to the employer. *See, e.g., Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 876 (9th Cir. 2001). At the same time, however, it is unrealistic to think that an employer will know what is happening absent notice. *See Martin v. New York*, No. 17cv9721, 2019 WL 2053992, at *5 (S.D.N.Y. May 9, 2019) (explaining that an employer cannot be liable for unreported harassment after commencing an investigation because the employer "could not reasonably be expected to have addressed harassment of which [the plaintiff] never complained"). That Ms. Cain had to bring Mr. White's possible violations of the stay-away order to the VA police chief's attention does not render the VA's remedial measures unreasonable. After she brought them to the VA police chief's attention and the chief spoke with Mr. White, Mr. White's behavior changed in accordance with what Ms. Cain believed the stay-away order required in the first place. (Doc. 17-3 at 59–60.)

18

As to Mr. White's decision to take overtime on Ms. Cain's shift, Ms. Cain asserts that Mr. White "took overtime on Plaintiff's shift so he could again be near her." (Doc. 21-6 at 11.) But the evidence demonstrates that Ms. Cain and Mr. White never had contact with one another when Mr. White took overtime on the same shift as Ms. Cain. (Doc. 17-3 at 65.) After Ms. Cain wrote her formal complaint, she had no further text communication with Mr. White, he did not touch her, he did not make any further complaint against her, and she did not see him after she transferred to the Buffalo office. (*Id.* at 67.)

Ms. Cain suggests other remedial actions that the VA might have taken. For example, she proposes that the VA could have had another employee carry the documents from Mr. White's new assignment in the pass and ID officer to where Ms. Cain worked, removed his ID access, or transferred him to another facility. (Doc. 21 ¶¶ 8, 11–13; Doc. 21-5 ¶¶ 16–20.) But the law does not require an employer to take the most severe remedial measures, all possible remedial measures, or the remedial measures that a plaintiff wants. *De Silva v. Bluegreen Corp.*, No. 96-CV-0683, 1997 WL 727523, at *9 (N.D.N.Y. Oct. 7, 1997) ("[W]here the employer presents evidence of its prompt, remedial actions . . . it is not enough for the plaintiff merely to point out ways in which she thinks the remedial actions could have been better or to point out how remedial actions did not meet her expectations." (internal quotation marks omitted)). Instead, the law requires only that the employer's remedial measures are reasonable. *Felty v. Regeneron Pharms., Inc.*, No. 18 Civ. 5667, 2021 WL 860379, at *14 (S.D.N.Y. Mar. 8, 2021) ("Reasonableness in the employer's response, rather than perfection, is the standard imposed by law.").

Based on the evidence in the record, no reasonable jury could find that the VA acted negligently by failing "to take appropriate remedial action." *Duch*, 588 F.3d at 762 (internal

quotation marks omitted). Therefore, the court grants the Secretary's motion for summary judgment.

## Conclusion

For the foregoing reasons, the Secretary of the Department of Veterans' Affairs Motion for Summary Judgment (Doc. 17) is GRANTED.

Dated this 9th day of August, 2023.

Geoffrey W. Crawford, Judge
United States District Court